IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| DWIGHT RATCLIFF,<br><br>               Plaintiff,<br><br>   vs.<br><br>CITY OF RED LODGE, DEPARTMENT OF POLICE, a Political Subdivision of the State of Montana, and Red Lodge Police Officer AL STUBER,<br><br>               Defendants. | CV 12-79-BLG-DWM-JCL<br><br>FINDINGS & RECOMMENDATION<br>AND ORDER |

Plaintiff Dwight Ratcliff ("Ratcliff") brings this action against the City of Red Lodge Police Department ("the City") and one of its officers, Al Stuber ("Officer Stuber"), asserting federal constitutional claims under 42 U.S.C. § 1983, and several pendent state law claims. The City and Officer Stuber have filed motions for summary judgment, which should be granted in part and denied in part as set forth below.

I.  **Background**

For summary judgment purposes, the Court is to take the material facts from the record and, where disputed, view them in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 474 U.S.

1

574, 587-88 (1986).  Before embarking on this task here, however, the Court must

determine whether to accept Ratcliff's untimely summary judgment response brief,

statement of genuine issues, and supporting evidentiary materials.

The City and Officer Stuber each filed separate motions for summary

judgment on November 15, 2013.  (Doc. 46, 49).  Pursuant to Local Rule

7.1(d)(B), Ratcliff's response brief was due 21 days later – no later than December

10, 2013.  Ratcliff did not file a response by the established deadline.  Nor did he

file a motion for extension of time.  Finally, on December 21, 2013, Ratcliff

moved for leave to file a late and overlength brief in response to both summary

judgment motions.  Ratcliff attached his proposed brief – which is 98 pages long

and has an unspecified word count in excess of that allowed by L.R. 7.1(d)(2)(A)

– to the motion, along with a statement of genuine issues and 25 evidentiary

exhibits.  (Doc. 60 through 60-27).

Notwithstanding the fact that all motions "must be accompanied by a brief

in support filed at the same time as the motion,"[1] Ratcliff waited three additional

days before filing a supporting brief.  (Doc. 61).  In that brief, Ratcliff explains

that he mistakenly thought he had 28 days within which to file his summary

judgment response brief under the Local Rules, and so believed his response was

---

[1] Local Rule 7.1(d)(1)(A).

due on December 16, 2013. But Ratcliff did not even meet that deadline, inexplicably waiting until December 20, 2013 to seek leave of Court to file an untimely response.

Ratcliff nonetheless asks that his late filing be allowed under Fed. R. Civ. P. 6(b)(1)(B), which provides that "the court may, for good cause" allow for an extension "on motion made after the time has expired if the party failed to act because of excusable neglect." To determine whether there has been "excusable neglect" within the meaning of Rule 6(b), the court must evaluate four factors: "(1) the danger of prejudice to the opposing party; (2) the length of the delay and its potential impact on the proceedings; (3) the reason for the delay; and (4) whether the movant acted in good faith." *Bateman v. U.S. Postal* Service, 231 F.3d 1220, 1223-24 (9th Cir. 2000) (*citing Pioneer Investment Services Co. v. Brunswick Associates Ltd. Partnership,* 507 U.S. 380, 395 (9th Cir. 2000)).

The length of the delay in this case was moderate, as Ratcliff moved for leave to file his untimely summary judgment response brief ten days after it was due. While the length of the delay alone would not necessarily prejudice the Defendants, the effect of that delay is compounded by the fact that Ratcliff's proposed 98-page brief is significantly oversized in violation of Local Rule 7.1(d)(2)(A). The Defendants would to some extent be prejudiced if the Court

were to accept Ratcliff's proposed filing, thereby putting the Defendants in the position of having to respond to a late-filed, significantly oversized brief with the March 3, 2014, trial date fast approaching.

More importantly, Ratcliff has not provided any legitimate reason for the delay. *See e.g. In re Veritas Software Corp Securities Litigation*, 496 F.3d 962, 973 (9th Cir. 2007) (affirming district court's decision finding based on the third factor – the reason for the delay – notwithstanding the fact that the length of the delay was not great and the opposing party had not established prejudice). According to Ratcliff, he misread the applicable rules and mistakenly believed his summary judgment response brief was not due until December 15, 2013. But "inadvertence, ignorance of the law, or mistakes construing the rules do not usually constitute 'excusable' neglect." *Kyle v. Campbell*, 28 F.3d 928, 931 (9th Cir. 1994) (*quoting Pioneer*, 507 U.S. at 392)). Regardless, Ratcliff did not file his response brief on December 15, 2013. Ratcliff explains that he was unable to do so due to the press of business and because he was waiting for the deposition transcript of his expert, John Sullivan. (Doc. 62, ¶¶ 10-12). But even assuming that is true, Ratcliff fails to explain why he did not follow standard practice and simply move for an extension of time within which to respond to the Defendants' motions. Instead of seeking an extension of time, Ratcliff apparently decided to

complete his response brief and submit it later that week in conjunction with a motion to accept the late filing. While there is no indication that Ratcliff's decision was necessarily motivated by bad faith, his failure to timely file was not the result of excusable neglect. If the Court were to conclude otherwise, then there would be nothing to prevent parties from routinely ignoring briefing deadlines and filing late briefs at their own convenience. Because Ratcliff has not shown excusable neglect for having missed the deadline for responding to the Defendants' motions for summary judgment, his motion for leave to file a late and oversized response brief is denied.

For present purposes, this means that the following facts are taken from the evidentiary materials submitted by the Defendants in support of their summary judgment motions. Consistent with well-established summary judgment standards, the Court views the facts in the light most favorable to Ratcliff as the non-moving party.

The events giving rise to Ratcliff's lawsuit took place on the afternoon of July 2, 2011. At approximately 1:00 p.m., the Carbon County Dispatch Center received a 911 call from Jessica Duede ("Duede"), who reported that two motorcyclists had just passed her vehicle on a double yellow line on Highway 308 heading into Red Lodge, Montana. Duede's vehicle came to a stop sign while she

was still on the phone with the dispatch officer, at which time she indicated that the two individuals had "parked their motorcycles and they are getting off and coming right at us." Duede reported that one of the motorcyclists punched her car, and then said there were "two of them" and "they are trying to attack my husband." (Doc. 51-1, 0:00-2:15).

The dispatch officer radioed Officer Stuber and informed him that a caller had just reported being passed by two motorcycles on Highway 308, headed into Red Lodge. Officer Stuber's patrol car was equipped with an "ICOP" video and audio recording system, which recorded this initial communication from dispatch and remained on as the events described below unfolded.[2] (Doc. 51-2). The dispatch officer told Officer Stuber that the 911 caller and the motorcycles were at a stop sign at the Rocky Fork Juniper, and the motorcyclists were "confronting the people at the stop sign there – there's a confrontation going on."

While Officer Stuber was en route to the scene, the dispatch officer notified him that one of the motorcycles had just pulled into the gas station and was

---

[2] Except where noted, the facts described below are shown on an ICOP video taken from the camera in Officer Stuber's patrol car. Where, as here, the events in question are captured on video, the Court will not adopt a version of the facts if it "is blatantly contradicted" by the videotape. *Scott v. Harris*, 550 U.S. 372, 380 (2007). The Court does, however, draw all reasonable inferences that can be made from the video in Ratcliff's favor. *Blankenhorn v. City of Orange*, 485 F.3d 463, 468 n. 1 (9th Cir. 2007).

6

turning around. The dispatch officer advised Officer Stuber that "they were yelling at each other – trying to hit their vehicle – get into their vehicle. They were passed on a double solid line is what started it." Dispatch then relayed that "one motorcycle is at the gas station" and "one motorcycle took off southbound."

Officer Stuber arrived on the scene approximately ten seconds later, and saw an unknown individual, later identified as Ratcliff, dismounting a motorcycle wearing full motorcycle gear and a helmet. Ratcliff, who was 70 years old at the time, began walking towards Officer Stuber. Officer Stuber told him to "stay right there." Ratcliff kept walking towards Officer Stuber and began removing his helmet, at which point Officer Stuber directed him two more times to "stay right there."

Officer Stuber can then be heard telling Ratcliff to "back off, back off, back off now, you got it?" Although it cannot be seen on the ICOP video, Officer Stuber drew his taser and pointed it at Ratcliff. (Doc. 5, ¶ 17). Ratcliff can then be seen stepping backwards a few paces as Officer Stuber instructed him to "turn around and put your hand on top of your head." Ratcliff turned around and placed his right hand on his helmet while holding a pair of sunglasses in his left hand. Officer Stuber lowered his taser and Ratcliff removed his helmet. Officer Stuber then moved in to handcuff Ratcliff. Officer Stuber grabbed Ratcliff's right arm,

placed his left hand on Ratcliff's right shoulder, and forced Ratcliff forward until he was bent face forward over the seat of his motorcycle. After what appears on the ICOP video to be a brief struggle, Officer Stuber handcuffed Ratcliff.

Once Ratcliff was handcuffed, Officer Stuber told him they had "an incident of an assault here, and there's a guy on a bike, and you're the guy on a bike – ready to leave." Red Lodge Police Officer Danielle Barnes then arrived on the scene and Ratcliff asked the officers to adjust his handcuffs. As Officer Barnes talked to Ratcliff, Officer Stuber adjusted his handcuffs. Officer Stuber asked Ratcliff "What's going on here," at which point Ratcliff provided his version of the incident reported by Duede.

After speaking with Ratcliff, Officer Stuber interviewed two other witnesses who had arrived on the scene. While Officer Stuber was speaking with the two witnesses, Officer Barnes led the still-handcuffed Ratcliff over to a small boulder to sit and wait. Several minutes later, Officer Stuber approached Ratcliff and advised him that he was being detained pending his investigation.

Officer Stuber then interviewed Duede and her husband, who provided their version of events. While Officer Stuber was interviewing the Duedes, Officer Barnes repositioned Ratcliff's handcuffs from the back to the front, and placed him the back seat of a patrol car. A few minutes later, another set of witnesses

arrived on the scene and relayed what they had seen of the incident to Officer Stuber. As a result of his investigation, Officer Stuber learned that it was Ratcliff's traveling companion, Kent Faulkner ("Faulkner"), who had been involved in the confrontation with the Duedes. Faulkner had left the scene on his motorcycle before Officer Stuber arrived.

After speaking with the Duedes and the various witnesses, Officer Stuber stated he was going to go "cut [Ratcliff] loose." By that time, Ratcliff had been detained in handcuffs for approximately 20 minutes. Officer Stuber released Ratcliff, and then cleared the call at 1:28 p.m. – approximately 25 minutes after first making contact with Ratcliff.

Ratcliff filed this lawsuit nearly two years later. (Doc. 1). He advances claims under 42 U.S.C. § 1983 against Officer Stuber and the City of Red Lodge for allegedly violating his rights under the First, Fourth, Fifth, Eighth, and Fourteenth Amendments. Dkt. 1. Ratcliff also assert state law claims for negligence per se, false imprisonment, assault and battery, negligent and/or intentional infliction of emotional distress, and violations of the Montana Constitution. Officer Stuber and the City have each moved for summary judgment on all claims.

## II.    <u>Summary Judgment Standards</u>

Under Federal Rule of Civil Procedure 56(a), a party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The party seeking summary judgment bears the initial burden of informing the Court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of any genuine issue of material fact. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 323 (1986). A movant may satisfy this burden where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 251 (1986).

Once the moving party has satisfied its initial burden with a properly supported motion, summary judgment is appropriate unless the non-moving party designates by affidavits, depositions, answers to interrogatories or admissions on file "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. 317, 324 (1986). The party opposing a motion for summary judgment "may not rest upon the mere allegations or denials" of the pleadings. *Anderson*, 477 U.S. at 248.

In considering a motion for summary judgment, the court "may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing*

*Prods.*, 530 U.S. 130, 150 (2000); *Anderson*, 477 U.S. at 249-50.  The Court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in the non-moving party's favor.  *Anderson*, 477 U.S. at 255; *Betz v. Trainer Wortham & Co., Inc.*, 504 F.3d 1017, 1020-21 (9th Cir. 2007).

Because Ratcliff has not shown that his failure to timely file a summary judgment response brief was due to excusable neglect, the Court is in the position of considering Defendants' motions without the benefit any responsive argument or evidentiary materials.  Although Local Rule 7.1(d)(1)(B) provides that a "failure to file a response brief may be deemed an admission that the motion is well-taken," the Ninth Circuit has made clear that a district court may not grant "summary judgment simply because a party fails to file an opposition or violates a local rule" and must "analyze the record to determine whether any disputed material fact [is] present."  *Ahanchian v. Xenon Pictures,* Inc., 624 F.3d 1253, 1258 (9th Cir. 2010).  *See also, Martinez v. Stanford*, 323 F.3d 1178, 1182 (9th Cir. 2003) ("a nonmoving party's failure to comply with local rules does not excuse the moving party's affirmative duty under Rule 56 to demonstrate it is entitled to judgment as a matter of law.").

Bearing these principles in mind, the Court turns now to the question of whether the Defendants have met their summary judgment burden of showing that

there are no material issues of fact and that they are entitled to judgment as a matter of law.

## III. **Discussion**

### A. **Federal Claims - 42 U.S.C. § 1983**

#### 1. Officer Stuber

Ratcliff alleges that Officer Stuber is liable under 42 U.S.C. § 1983 for violating his rights under the First, Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution. It is important to note at the outset that Ratcliff does not specify whether he is suing Officer Stuber in his individual or official capacity. Because Ratliff has named the City of Red Lodge as a defendant, however, any official capacity claims against Officer Stuber would be superfluous and subject to summary dismissal on that basis. *See e.g. Hafer v. Melo*, 502 U.S. 21, 25 (1991) (When a plaintiff brings such a claim against an individual defendant in his official capacity, the claim "generally represents only another way of pleading an action against an entity of which an officer is an agent" and is treated as a suit against the employing governmental entity.) (internal quotation marks omitted). The Court will thus assume that Ratcliff is suing Officer Stuber in his individual capacity.

To prevail on such a claim under 42 U.S.C. § 1983, "a plaintiff must show (1) that the conduct complained of was committed by a person acting under color of state law; and (2) that the conduct deprived the plaintiff of a constitutional right." *Balistreri v. Pacifica Police Dep't.,* 901 F.2d 696, 699 (9th Cir. 1990). Officer Stuber has raised qualified immunity as a defense to Ratcliff's § 1983 claims. As state actors, law enforcement officers like Officer Stuber are entitled to qualified immunity from liability in a § 1983 action if their conduct "either does not violate a federal constitutional right, or the constitutional right was not clearly established on the date of the alleged violation." *Broam v. Bogan*, 320 F.3d 1023, 1028 (9th Cir. 2003) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Qualified immunity provides an immunity from suit rather than a mere defense to liability." *Mattos v. Agarano*, 590 F.3d 1082, 1086 (9th Cir. 2010).

Courts addressing a law enforcement officer's claim of qualified immunity are to follow the two-part analysis established by the United States Supreme Court in *Saucier.* The "threshold question" under the *Saucier* analysis is whether "[t]aken in the light most favorable to the party asserting the injury," the facts as "alleged show the officer's conduct violated a constitutional right[.]" *Saucier*, 533 U.S. at 201. If there was no constitutional violation, no further inquiry is necessary. *Saucier,* 533 U.S. at 201.

If the facts as alleged do show that the officer's conduct violated a constitutional right, however, the court must next consider "whether the right was clearly established in light of the specific context of the case." *al-Kidd v. Ashcroft*, 580 F.3d 949, 964 (9th Cir. 2009). "For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *al-Kidd*, 580 F.3d at 964 (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)).

Before going any further, the Court must identify the federal constitutional right or rights at issue. *Graham v. Connor*, 490 U.S. 386, 394 (1989). Ratcliff alleges that Officer Stuber violated his First, Fourth, Fifth, Eighth, and Fourteenth Amendment rights by: (1) unreasonably intruding on his "person and privacy"; (2) subjecting him to cruel and unusual punishment while he was in custody and using excessive force against him; (3) acting with deliberate indifference after having assumed custody over him, and failing to care for him properly; (4) abusing and/or neglecting him while he was in custody "in a way that shocks the conscience and violates his due process and equal protection rights." (Doc. 1, ¶ 28).

Although Ratcliff invokes several constitutional provisions, the United States Supreme Court has held that "that *all* claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest, investigatory

stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard...." *Graham*, 490 U.S. at 395. Ratcliff's various constitutional claims are all premised entirely on his allegations that Officer Stuber wrongfully detained him on the day in question, and used excessive force against him during the course of their encounter. As *Graham* instructs, such claims are most properly characterized as invoking the protections of the Fourth Amendment, which guarantees citizens the right to be free from unreasonable searches and seizures. *Graham*, 490 U.S. at 396.

> a. *Initiating Investigative Stop*

To the extent Ratcliff claims his Fourth Amendment rights were violated because Officer Stuber did not have reasonable suspicion to initiate an investigatory stop, he is mistaken.

It is well-established that law enforcement officers may conduct an investigatory stop if they have a reasonable suspicion that an individual is involved in criminal activity. *United States v. Colin*, 314 F.3d 439, 442 (9th Cir. 2002). Reasonable suspicion exists if there are "specific articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity." *Colin*, 314 F.3d at 442 (*quoting United States v. Lopez-Soto*, 205 F.3d 1101, 1104-05 (9th Cir. 2000)).

Here, the undisputed facts establish that Officer Stuber had reasonable suspicion to initiate a *Terry* stop. Moments before the stop, dispatch advised Officer Stuber that two motorcycle riders had been involved in an altercation with another vehicle. Officer Stuber received information that the motorcycle riders were actively confronting the people in the vehicle at a stop sign in front of the Rocky Fork Juniper. While Officer Stuber was en route to the scene, dispatch informed him that the motorcycle riders were trying to "hit" and "get into" the vehicle, and that one of the motorcycles had just pulled into a nearby gas station. Dispatch then advised Officer Stuber that one motorcycle was still at the gas station, but the other one had taken off southbound. When Officer Stuber arrived at the gas station seconds later, he saw Ratcliff dismounting from a motorcyle. There is no indication that there were any other motorcycle riders in the vicinity at that time. Based on the information provided by dispatch, it was reasonable for Officer Stuber to suspect that Ratcliff may have been involved in an altercation with another vehicle as reported by the 911 caller. Because he had a reasonable suspicion that Ratcliff had been involved in criminal activity, Officer Stuber did not violate Ratcliff's Fourth Amendment rights by conducting an investigatory stop and is entitled to qualified immunity on any claim to the contrary.

      b.    *Scope of Investigative Stop*

To the extent Ratcliff alleges that Officer Stuber unreasonably placed him in handcuffs and prolonged his detention, thereby converting the investigatory stop into an arrest for which probable cause was lacking, his claim survives summary judgment.

Detention pursuant to a *Terry* stop "must be temporary and last no longer than is necessary to effectuate the purpose of the stop, unless further reasonable suspicion, supported by articulable facts, emerges." *United States v. Brigham,* 382 F.3d 500, 507 (5th Cir. 2004) *(citing United States v. Dortch*, 199 F.3d 193, 200 (5th Cir. 1999).  The critical inquiry in considering whether the length of detention was unreasonable "is whether the officers 'diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.'" *Liberal v. Estrada*, 632 F.3d 1064, 1080 (9th Cir. 2011) *(quoting United States v. Torres-Sanchez*, 83 F.3d 1123, 1129 (9th Cir. 1996)).

In addition, "[i]t is well settled that when an officer reasonably believes force is necessary to protect his own safety or the safety of the public, measures used to restrain individuals, such as stopping them at gunpoint and handcuffing them, are reasonable." *Alexander v. Count of Los Angeles*, 64 F.3d 1315, 1320 (9th Cir. 1995).  "'[T]he use of force during a stop does not convert the stop into an arrest if

it occurs under circumstances justifying fears for personal safety.'" *Alexander*, 64 F.3d at 1320 (*quoting United States v. Buffington*, 815 F.2d 1292, 1300 (9th Cir. 1987)). Consistent with this principle, "[a] brief, although complete, restriction of liberty, such as handcuffing, during a *Terry* stop is not a de facto arrest, if not excessive under the circumstances." *Haynie v. County of Los Angeles*, 339 F.3d 1071, 1077 (9th Cir. 2009) (holding that officers responding to a report of men with guns did not act unreasonably by handcuffing a belligerent suspect and placing him in a patrol car for nearly 20 minutes). *See also Gallegos v. City of Los Angeles*, 308 F.3d 987, 991-92 (9th Cir. 2002) (explaining that "an investigative detention does not automatically become an arrest when officers draw their guns, use handcuffs, or place a suspect in the back of a patrol car") (citations omitted); *Allen v. City of Los Angeles*, 66 F.3d 1052, 1056 (9th Cir. 1995).

Officer Stuber argues it is evident based on the information provided by dispatch and what is shown on the ICOP video that he reasonably feared for his safety while making the stop, and so did not exceed the limits of *Terry* stop by drawing his taser and detaining Ratcliff in handcuffs. When Officer Stuber arrived on the scene, he saw Ratcliff dismounting from a motorcycle and suspected that he may have been one of the two individuals involved in the altercation reported by the 911 caller. Officer Stuber explains that he drew his taser because Ratcliff, who

was still wearing his motorcycle helmet at the time, began walking towards him and ignored his repeated commands to "stay right there" and "back off." At his deposition, Officer Stuber recalled directing Ratcliff to put his hands on his head. (Doc. 51-3, at 9). Because Ratcliff responded by placing only his right hand on his head and then removing his helmet, Officer Stuber considered him noncompliant. (Doc. 51-3, at 9). Officer Stuber also noted that Ratcliff was holding something in his left hand, but because he was focused on the fact that Ratcliff was not following his commands, he did not know if the item was a weapon. (Doc. 51-3, at 10). Officer Stuber maintains that he reasonably feared for his safety in light of Ratcliff's noncompliant behavior, and so was justified in handcuffing him and restraining him in a patrol car until his investigation was completed.

But the events on the video are subject to a different, equally plausible and reasonable interpretation. Ratcliff was alone when Officer Stuber arrived on the scene, and there was no evidence of any ongoing altercation or confrontation. Ratcliff was not behaving aggressively or belligerantly. In fact, it is reasonable to infer from the video that Ratcliff, who was 70 years old and wearing a motorcycle helmet at the time, simply may not have been able to hear Officer Stuber's commands to "stay right there" and "back off," particularly in light of the fact that the patrol car's sirens were on at the time. And while Officer Stuber recalls

directing Ratcliff to place both his hands on his head, he can be heard on the video directing Ratcliff to just place one "hand" on his head – a command with which Ratcliff promptly complied. It is readily apparent from the video that Ratcliff was holding a pair of sunglasses in his left hand, not a weapon. Whether it was objectively reasonable for Officer Stuber to fear for his safety under these circumstances, thereby justifying his decision to draw his taser and detain Ratcliff in handcuffs for the approximately 20 minute duration of his investigation, is a question for the trier of fact.

As the caselaw cited above suggests, it was clearly established at the time of Officer Stuber's alleged misconduct in July 2011 that exceeding the scope of a lawful *Terry* stop and making an unlawful arrest violates a suspect's Fourth Amendment right to be free from unreasonable seizure. Because there is a question of fact as to whether Officer Stuber violated Ratcliff's clearly established Fourth Amendment right to free from unreasonable seizure by drawing his taser and detaining Ratcliff in handcuffs, the Court cannot say as a matter of law that Officer Stuber is entitled to qualified immunity on this aspect of Ratcliff's claim.

b. *Excessive Force*

Ratcliff also alleges that Officer Stuber used an excessive level of force during the course of their encounter. Fourth Amendment excessive force claims

must be evaluated "under an objective reasonableness standard." *Espinosa v. City and County of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). The proper inquiry is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397. Whether an officer used excessive force in violation of the Fourth Amendment is ordinarily a question of fact for a jury, and summary judgment in an excessive force case should be granted sparingly. *Smith v. City of Hemt*, 394 F.3d 689, 701 (9th Cir. 2005).

In assessing, as a matter of law, whether the amount of force used was constitutionally reasonable, the Court "must balance the extent of the intrusion on the individual's Fourth Amendment rights against the government's interests to determine whether the officer's conduct was objectively reasonable based on the totality of the circumstances." *Espinosa*, 598 F.3d at 537. "Stated another way, [the Court] must 'balance the amount of force applied against the need for that force.'" *Bryan v. MacPherson*, 608 F.3d 614, 620 (9th Cir. 2010) (*quoting Meredith v. Erath*, 342 F.3d 1057, 1061 (9th Cir. 2003)).

This balancing analysis typically involves three steps. *Espinosa*, 598 F.3d at 537; *Mattos*, 590 F.3d at 1086. First, the court must "assess the gravity of the particular intrusion on Fourth Amendment interests by evaluating the type and amount of force inflicted." *Mattos*, 590 F.3d at 1086. Second, the court considers "the government's interests by assessing (1) the severity of the crime; (2) whether the suspect posed an immediate threat to the officers' or public's safety; and (3) whether the suspect was resisting arrest or attempting to escape." *Espinosa*, 598 F.3d 537. "A simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern." *Bryan v. McPherson*, 630 F.3d 805, 826 (9th Cir. 2010). Finally, the court weighs "the gravity of the intrusion against the government's interest to determine whether the force used was constitutionally reasonable." *Mattos*, 590 F.3d at 1086.

As these cases instruct, the Court begins by assessing the "gravity of the intrusion" on Ratcliff's Fourth Amendment rights occasioned by Officer Stuber's conduct. The Ninth Circuit has repeatedly held that the use of handcuffs during an investigatory detention must be justified by the circumstances. *Meredith v. Erath*, 342 F.3d 1057, 1062 (9th Cir. 2003). The fact that Officer Stuber drew his taser and then used handcuffs to detain Ratcliff for the approximately 20 minute duration of

his investigation "substantially aggravated" the intrusiveness of that detention and the corresponding intrusion on Ratcliff's Fourth Amendment rights. *Meredith*, 342 F.3d at 1062 (recognizing that handcuffing substantially aggravates the intrusiveness of an investigatory detention). This is so particularly in light of the fact that Ratcliff spent a good portion of that time handcuffed in a police squad car.

To determine whether the gravity of the intrusion on Ratcliff's Fourth Amendment rights was justified, the Court must next consider the government's countervailing interests. Based on the information provided by dispatch, Officer Stuber suspected Ratcliff of having been involved in a confrontation with another motorist. Officer Stuber had no information suggesting that weapons were involved, or that anyone had been injured in the incident. Thus, the crime Ratcliff was suspected of having been involved with was not particularly severe. As discussed above, the question of whether it was objectively reasonable for Officer Stuber to fear for his safety under the circumstances is for the trier of fact to resolve. The same holds true for the question of whether Ratcliff was being noncompliant or resisting Officer Stuber's attempts to place him in handcuffs. The Court simply cannot resolve those issues as a matter of law based on what is shown on the ICOP video. Because these issues are unresolved, the government's countervailing interest cannot be said as a matter of law to have been particularly

strong.

Weighing the gravity of the intrusion against the government's interest, and drawing all reasonable inferences from the ICOP video in Ratcliff's favor, the Court cannot say as a matter of law that the force Officer Stuber used was objectively reasonable under the circumstances. For qualified immunity purposes, the Fourth Amendment right to be free from excessive force in the context of an arrest or *Terry* stop was clearly established at the time of Officer Stuber's alleged misconduct in July 2011. Because a reasonable trier of fact could find that Officer Stuber violated Ratcliff's clearly established Fourth Amendment right to be free from excessive force, Officer Stuber has not shown that he is entitled to summary judgment based on qualified immunity.

     2.   <u>City of Red Lodge</u>

Ratcliff also seeks to hold the City liable under § 1983 for the constitutional violations alleged. The City moves for summary judgment on the ground that Ratcliff has not shown that a municipal custom, policy, or practice played a part in the constitutional violations he alleges or otherwise presented any evidence that would establish the necessary prerequisites for municipal liability.

"A governmental entity may not be held liable under 42 U.S.C. § 1983 unless a policy, practice, or custom of the entity can be shown to be a moving force

behind a violation of constitutional rights." *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9ᵗʰ Cir. 2011) (citing *Monell*, 436 U.S. at 694). In some cases, a governmental entity may also be held liable for "acts of omission," like failing to develop and implement policies and procedures or failing to adequately train its employees. *Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1249 (9ᵗʰ Cir. 2010).

To establish municipal liability based on a failure to act, a plaintiff must show: (1) that he was deprived of a constitutional right; "(2) that the municipality had a policy; (3) that this policy 'amounts to deliberate indifference' to the plaintiff's constitutional right; and (4) that the policy is the 'moving force behind the constitutional violation.'" *Oviatt v. Pearce*, 954 F.2d 1470, 1474 (9ᵗʰ Cir. 1992) (*quoting City of Canton v. Harris*, 489 U.S. 378, 389-91(1989)). Absent a formal governmental policy, a plaintiff may establish a policy or custom of a municipality "by showing 'a longstanding practice or custom which constitutes the 'standard operating procedure' of the local government entity.'" *Rosenbaum v. City and County of San Francisco*, 484 F.3d 1142, 1155 (9ᵗʰ Cir. 2007). To constitute the standard operating procedure of a local government entity, the custom or practice must be "so persistent and widespread," and "so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Monell v. Dep't of Soc. Serv.*,

436 U.S. 658, 691 (1978); *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (citation omitted). "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carry out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).

To establish deliberate indifference, a plaintiff must show that the need to act "is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1249 (9th Cir. 2010) (*quoting City of Canton*, 489 U.S. at 390). A municipality's action is the moving force behind the constitutional deprivation, if there "is a direct causal link between the municipal action and the deprivation of federal rights." *Board of County Com'rs of Bryan County v. Brown*, 520 U.S. 397, 4040 (1997).

Although the Court has prohibited Ratcliff from filing his untimely and oversized summary judgment response brief, the basic grounds on which he apparently hopes to establish municipal liability are set forth in his Complaint and discovery responses. The Complaint alleges that Officer Stuber's conduct was "consistent with and sanctioned and promoted by the effective and historic policy

of the City of Red Lodge, Department of Police, which has demonstrated a pattern of conduct of which [Ratcliff's] treatment was part and parcel – a pattern of abuse and violations of the Constitutional rights of citizens..." (Doc. 1, ¶ 15). Ratcliff elaborated in his discovery responses that he was "aware of and continues to explore several tips and leads involving incidents in which Officer Stuber and other Red Lodge police officers are suspected of" violating the constitutional rights of other citizens. (Doc. 48-4, at 2-3).

While Ratcliff alleges the City has a custom or practice of ignoring or encouraging constitutional violations by its police officers, he has not come forward with any evidence to that effect. Even assuming Ratcliff could point to a few isolated incidents of unconstitutional police conduct, it would take far more than that to establish that the City maintained a standard operating procedure of ignoring or encouraging widespread constitutional violations. Nor has Ratcliff presented any evidence that the City was deliberately indifferent to any constitutional violations, or that the City caused, or was the moving force, behind his alleged injury.

To the extent Ratcliff seeks to hold the City liable under § 1983, his claims fail as a matter of law. The City's motion for summary judgment on Ratcliff's § 1983 claims should be granted accordingly.

**B.   State Law Claims**

Ratcliff brings several state claims against both Defendants.  He alleges: (1)

negligence per se; (2) state constitutional violations; (3) negligence; (4) false

imprisonment; (5) assault and battery, and (6) negligent and/or intentional

infliction of emotional distress.

1.   Individual Capacity Claims

To the extent Ratcliff advances these claims against Officer Stuber in his

individual capacity, Officer Stuber argues he entitled to statutory immunity

pursuant to Mont. Code Ann. § 2-9-305(5).  That statute provides:

> In an action against a governmental entity, the employee whose conduct gave
> rise to the suit is immune from liability by reasons of the same subject matter
> if the governmental entity acknowledges...that the conduct upon which the
> claim is brought arises out of the course and scope of the employee's
> employment, unless [certain exclusions apply.]

Mont. Code Ann. § 2-9-305(5).

Consistent with this statutory provision, the Montana Supreme Court has

held that "where an action is brought against a [governmental entity] based on

actionable conduct by an employee, the employee is immune from individual

liability for the conduct if the [governmental entity] acknowledges that the conduct

arose out of the course and scope of the employee's official duties." *Kenyon v.*

*Stillwater County*, 835 P.2d 742, 745 (Mont. 1992), overruled on other grounds by

*Heiat v. Eastern Montana College*, 912 P.2d 787, 793 (Mont. 1996). *See also*

*Germann v. Stephens*, 137 P.3d 545, 553 (Mont. 2006).

Here, the City has stipulated that Officer Stuber was at all times acting

within the course and scope of his official duties as a law enforcement officer.

(Doc. 18, at 14; Doc. 48, ¶ 27; Doc. 51, ¶ 48).   Officer Stuber is thus entitled to

statutory immunity with respect to any individual capacity state law claims, and the

City is obligated to indemnify or "pay any judgment for damages" that might

ultimately be entered in Ratcliff's favor.  Mont. Code Ann. § 2-9-305(2) and (3).

Officer Stubar's motion for summary judgment on the individual capacity state law

claims is properly granted.

> 2.   <u>Negligence Per Se</u>

Ratcliff alleges that the City was negligent per se based on violations of

Montana criminal statutes defining the offenses of assault, aggravated assault,

assault with a weapon, intimidation, mistreating prisoners, criminal endangerment,

negligent endangerment, kidnapping, aggravated kidnapping, custodial

interference, criminal mischief, official misconduct, and disorderly conduct.  (Doc.

1, ¶ 32).  The City moves for summary judgment on the ground that the criminal

statutes cited by Ratcliff do not provide for a private right of action.  The City is

correct.

"Negligence per se is a failure to comply with a legal mandate." *Doyle v. Clark*, 254 P.3d 570, 576 (Mont. 2011). To prevail on a claim of negligence per se, a plaintiff must establish, among other things, that the defendant violated a particular statute, and "that the statute allegedly violated allows a private right of action." *Doyle*, 254 P.3d at 576-77. "[I]f the statute in question may be enforced only by the state, a private individual may not attempt to recover for violation of the statute under a negligence per se claim." *Doyle*, 254 P.3d at 577.

As in *Doyle*, all of the statutes that form the basis of Ratcliff's claim for negligence per se subject "the violator to sanctions in the form of a fine, penalty, or imprisonment." *Doyle*, 254 P.3d at 577. As was also the case in *Doyle*, nothing in the statutes at issue "suggests that the Legislature intended to grant individuals a private right of action." *Doyle*, 254 P.3d at 577. Because *Doyle* made clear that Ratcliff cannot establish negligence per se under these circumstances, the City is entitled to summary judgment on this claim.

### 3. State Constitutional Violations

Ratcliff alleges that Officer Stuber violated his rights under several sections of Article II of the Montana Constitution, and that the City is subject to respondeat superior liability for those violations. Because they are all premised on the theory that Officer Stuber wrongfully detained him and used excessive force, these claims

are properly analyzed under Article II, § 11 of the Montana Constitution, which prohibits unreasonable searches and seizures. That analysis is substantively the same as the excessive use of force standards developed under the Fourth Amendment. *See e.g. Todd v. Baker*, 2012 WL 1999529 *9 (D. Mont. 2012).

The City argues that Ratcliff's state constitutional claims fail for the same reasons that his federal constitutional claims do. As discussed above, however, Ratcliff's Fourth Amendment claims survive summary judgment. It necessarily follows, then that Ratcliff's claims under Article II, § 11 of the Montana Constitution survive as well.

4. <u>Negligence</u>

Ratcliff alleges that Officer Stuber was "negligent in failing to use reasonable care by detaining and arresting [him] without probable cause (or even reasonable or particularized suspicion) of criminal activity" and "failing to use reasonable care in taking him into custody to ensure his safety and to honor his right not be brutalized." (Doc. 1, ¶ 42).

The City argues this claim is barred by the public duty doctrine,[3] which

---

[3] Although the City doe not make this argument in is own summary judgment brief, it has expressly adopted Officer Stuber's summary judgment arguments, including his argument that he protected by the public duty doctrine. (Doc. 47, at 30).

provides that "a governmental entity cannot be held liable for an individual plaintiff's injury resulting from a governmental officer's breach of a duty owed to the general public rather than to the individual plaintiff." *Eklund v. Trost*, 151 P.3d 870, 878 (Mont. 2006).

But the Montana Supreme Court has applied the public duty doctrine and its exceptions only in those cases where the law enforcement has allegedly failed to protect the plaintiff from harm caused by a third party or other independent source. *See e.g. Gonzales v. City of Bozeman*, 217 P.3d 487 (Mont. 2009) (holding that public duty doctrine shielded law enforcement officers who allegedly failed to protect the plaintiff from a criminal suspect who raped her, where neither the plaintiff nor the criminal suspect was in custody and no other exception to the doctrine applied); *Prindel v. Ravalli County*, 133 P.3d 165 (Mont. 2006 (holding that special relationship exception to public duty doctrine applied where stabbing victim claimed that county jail negligently failed to incarcerate the perpetrator); *Latray v. City of Havre*, 999 P.2d 1010 (Mont. 2000) (holding that special relationship exception to the public duty doctrine applied where nurse claimed law enforcement allegedly failed to prevent an intoxicated assailant – over whom they had custody and control – from assaulting her) (overruled on other grounds); *Lopez v. Great Falls Pre-Release Services, Inc.*, 986 P.2d 1081(Mont. 1999) (holding that

special relationship exception to the public duty doctrine applied where alleged plaintiff claimed that pre-release center negligently allowed one of its inmates to attack him) (overruled on other grounds); *Nelson v. Driscoll*, 983 P.2d 972 (Mont. 1999) (holding that special relationship exception to the public duty doctrine applied where police officer voluntarily assumed duty to protect the plaintiff, who was then killed by a motorist while walking on a road).

The Montana Supreme Court's application of the public duty doctrine and its exceptions is consistent with the prevailing view in other jurisdictions, which is that the doctrine does not even come into play in the first instance where, as here, a law enforcement officer is the sole alleged cause of the plaintiff's injury. In *Liser v. Smith,* 254 F.Supp.2d 89, 102 (D.D.C. 2003), for example, the court concluded that the public duty doctrine "is wholly inapposite" where "the alleged harm was brought about directly by the officers themselves." As the court explained it, any "claim that the government has no general duty to protect particular citizens from injury is simply a non-sequitur where the government itself is the solely responsible for that injury, which it has caused by the allegedly negligent use of its own police powers." *Liser*, 254 F.Supp.2d at 102. *See also Jones v. State*, 38 A.3d 333, 347 (Md. 2012) (citing several cases and expressly joining those "jurisdictions that recognize the public duty doctrine does not apply if law enforcement is not

33

engaged in protecting the public from an injurious force caused by a member of the public, but rather is itself the alleged injurious force.").

Admittedly, courts in some jurisdictions apply the doctrine more broadly. In Washington, for example, courts have held that the public duty doctrine bars claims against law enforcement officer for negligence arising out of the excessive use of force. *See e.g.*, *James v. City of Seattle*, 2011 WL 6150567, at * 16 (W.D. Wash. 2011); *Jimenez v. City of Oympia*, 2010 WL 3061799, at *15 (W.D. Wash 2011).

The Court is confident, however, that the Montana Supreme Court would follow the more reasoned approach taken by those courts holding that the public duty doctrine and its exceptions are simply irrelevant where, as here, it is alleged that law enforcement officers are themselves the injurious force.[4] This is particularly so in light of the fact that the Montana Supreme Court has consistently applied the doctrine and its exceptions in cases where law enforcement has allegedly failed to protect the plaintiff from harm caused by a third party.

*Scott v. Henrich*, 958 P.2d 709 (Mont. 1998) is also instructive. Although *Henrich* did not specifically consider the public duty doctrine, the case involved

---

[4] Because the Montana Supreme Court has not yet addressed this specific issue, this Court must make a reasonable determination of the result it would likely reach, using "decisions from other jurisdictions statutes, treatises, and restatements as guidance." *Strother v. S. Cal. Permanente Med. Group*, 79 F.3d 859, 965 (9th Cir. 1996).

negligence claims against law enforcement officers who allegedly used excessive force when they shot a suspect during a confrontation. *Henrich*, 958 P.2d 490-91. Looking to the traditional negligence standard of a "reasonable and prudent person under the circumstances,"[5] the Montana Supreme Court concluded there were genuine issues of material fact as to whether the officers had acted reasonably, and so reversed the district court's order granting summary judgment in the defendants' favor. *Henrich*, 958 P.2d at 496. *Henrich* is consistent with this Court's conclusion that the public duty doctrine does not prevent a plaintiff from claiming negligence where, as here, it is alleged that law enforcement officers are solely responsible for the plaintiff's injuries. *See also Rickard v. Pardis*, 539 P.2d 718, 720 (Mont. 1973)(recognizing that personal liability may be imposed on a law enforcement officer for negligent conduct in the performance of his duties as a public peace officer.).

Because Ratcliff's negligence claim alleges that Officer Stuber was himself the sole injurious force, the public duty doctrine is simply inapposite.[6] Here, as in

_____

[5] *Henrich*, 958 P.2d at 711. *See also Scott v. Henrich*, 938 P.2d 1362, 1368 (Mont. 1997).

[6] To the extent this conclusion is inconsistent with *Todd v. Baker*, 2012 WL 1999529 *12 (D. Mont. 2012), the Court notes that plaintiff's only argument in that case was that the custodial exception to the public duty doctrine should apply. Thus, the court did not specifically consider whether the doctrine is properly

*Henrich*, Officer Stuber had a general duty of care, and was obligated to act as "a reasonable and prudent person [would] under the circumstances in accordance with traditional negligence standards in Montana." *Henrich,*, 958 P.2d at 493.

This brings the Court to the City's next argument, which is that summary judgment is appropriate because the undisputed evidence establishes that Officer Stuber acted reasonably, and no reasonable juror could conclude that Officer Stuber was negligent. The Court disagrees. As discussed above, drawing all reasonable inferences from the video in Ratcliff's favor, a reasonable jury could find that Officer Stuber used excessive force. The question of whether Officer Stuber used excessive force is a factual one for the jury. So too, then, is the question of the whether Officer Stuber breached his duty of care by using excessive force.

Finally, the City incorporates Officer Stuber's one-sentence argument that Ratcliff's negligence claim fails "because there is no expert testimony establishing what 'duty' applies." (Doc. 50, at 28). While expert testimony may be permissible to assist the jury in evaluating a claim of negligence based upon the assertion that a law enforcement officer used excessive force, neither Defendant cites any authority

_____

invoked in the first instance where, as here, "law enforcement is not engaged in protecting the public from an injurious force caused by a member of the public, but rather is itself the alleged injurious force." *Jones*, 38 A.3d at 347.

from Montana or elsewhere supporting the proposition that expert testimony is necessary in an excessive force case of this nature. *See e.g. United States v. DiSantis*, 565 F.3d 354, 364 (7th Cir. 2009 ("Although in some instances expert testimony may assist the jury in determining whether an officer used excessive force, expert testimony is by no means required in all excessive force cases) (*citation omitted*)*; Parker v. Gerrish*, 547 F.3d 1, 9 (1st Cir. 2008) (citing *Jennings v Jones,* 499 F.3d at 15 (1st Cir. 2007) for the proposition that "while such testimony is neither required nor always appropriate, expert testimony can be helpful to jurors in explaining police control techniques unfamiliar to many jurors.). The City's motion for summary judgment on Ratcliff's negligence claim should be denied accordingly.

Ratcliff also seeks to hold the City directly liable for negligently hiring and supervising Officer Stuber. (Doc. 1, ¶ 42). But because he has not presented any evidence in support of this claim, it should be summarily dismissed.

### 5. Assault and Battery

"The tort of assault is distinct from the tort of battery." *Saucier ex rel. Mallory v. McDonald's Restaurants of Mont., Inc.*, 179 P.3d 481, 494 (Mont. 2008). "[B]attery is an 'intentional contact by one person with the person of another which is harmful or offensive,' while the tort of assault is 'any intentional

*threat* of harmful or offensive contact with another by force under circumstances which create a well founded fear of such contact, coupled with the apparent present ability to carry out the threat.'" *Saucier*, 179 P.3d at 494 (*quoting* Montana Pattern Instructions M.P.I2d 9.01).

The City argues it is entitled to summary judgment based on the principle that an officer is immune from intentional tort liability as long as he uses "no more force than is reasonably necessary under the circumstances to properly perform his official duties." *Luciano v. Ren*,  589 P.2d 1005, 1008 (Mont. 1979).  As discussed above, however, whether Officer Stuber used excessive force while handcuffing Ratcliff is a question of fact.  A reasonable trier of fact could potentially find based on the ICOP video that Officer Stuber had intentional, harmful or offensive contact with Ratcliff.  Whether Officer Stuber was justified in drawing his taser, and whether that conduct constituted the tort of assault, presents another factual question.  Because a reasonable trier of fact could find in Ratcliff's favor on his claims of assault and batter, summary judgment is not appropriate.

> 6.     False Imprisonment

To prevail on a claim of false imprisonment, Ratcliff must present evidence that he was restrained against his will, and that his restraint was unlawful.  *Kichnet v. Butte-Silver Bow County*, 274 P.3d 740, 745 (Mont. 2012).  As discussed above,

however, whether it was lawful for Officer Stuber to restrain Ratcliff in handcuffs under the circumstances is question for the trier of fact. This means that Ratcliff's claim of false imprisonment also survives summary judgment.

### 8. Intentional and Negligent Infliction of Emotional Distress

Ratcliff alleges claims for intentional and/or negligent infliction of emotional distress based on Officer Stuber's conduct. Ratcliff asserts in his Complaint that he "has suffered severe emotional and psychological distress, humiliation, embarrassment and pain and discomfort, as a direct result" of Officer Stuber's actions. (Doc. 1, ¶ 21).

The Montana Supreme Court has established a heightened standard of proof for independent claims of negligent or intentional infliction of emotional distress. *Sacco v. High County Independent Press, Inc,* 896 P.2d 411, 429 (Mont. 1995). A plaintiff claiming intentional or negligent infliction of emotional distress must demonstrate that he suffers from "serious or severe" emotional distress. *Sacco*, 896 P.2d at 429. To satisfy this standard, a plaintiff must ultimately prove that his emotional distress was "so severe that no reasonable person could be expected to endure it." *Lorang v. Fortis Ins. Co.*, 192 P.3d 186, 222 (Mont. 2008) (*quoting Sacco*, 896 P.2d at 425-26, 428-29)).

The City argues that Ratcliff has not presented any evidence that he suffered

from serious or severe emotional distress, as defined by *Sacco*. The Court agrees.

Ratcliff testified at his deposition that he can no longer ride a motorcycle because of the emotional distress he suffered after his encounter with Officer Stuber, but he admitted that he has not sought any professional counseling for his alleged emotional distress. (Doc. 48-5, at 2-3). Evidence like this falls short of satisfying the heightened evidentiary burden established by *Sacco*. Because Ratcliff has not pointed to any evidence that he suffered from serious or severe emotional distress, as defined by *Sacco*, his claims for negligent and intentional infliction of emotional distress should be summarily dismissed.

## III.  Conclusion

Based on the foregoing,

IT IS RECOMMENDED that  the Defendants' Motions for Summary Judgment be GRANTED IN PART and DENIED IN PART as set forth above.

IT IS ORDERED that Plaintiff's Motion for Leave to Allow Late Filing and Motion to Allow Filing of Oversized Brief is DENIED.

DATED this 10th day of January, 2014

Jeremiah C. Lynch
United States Magistrate Judge